**APPEAL NUMBER 16-3090**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE THIRD CIRCUIT**

---

**UNITED STATES OF AMERICA,**

**Appellee**


**CLIFFORD WARES,**

**Appellant**

---

**BRIEF FOR APPELLANT**

---

Appeal From A Judgment In A Criminal Case Entered On

July 7, 2016, in the United States District Court for the District of New Jersey,

At Criminal Number 2:15-cr-570 (ES)

By the Hon. Esther Saras

---

Thomas Ambrosio, Esq.
750 valley Brook Ave.
Lyndhurst, NJ 07071
(201) 935-3005

# TABLE OF CONTENTS

Page

Table of Authorities…………………………………………………………… iii-iv

Jurisdictional Statement……………………………………………………….1

Statement of Related Cases and Proceedings…………………………………2

Statement of & Preservation of Issues……………………………………  2-3

Statement of the Case……………...…….…………………………………  3-10

Summary of Argument…………………………………………………….. 11

Argument      …………………………………………………………12-28

POINT I

THERE WAS AN ABUSE OF DISCRETION BY THE
DISTRICT COURT IN DENYING SEVERENCE SINCE THE
CHARGES AGAINST KAITLYN AND HANNAH WERE
VIRTUALLY IDENTICAL BUT BASED UPON DIFFERING
EVIDENCE WITH OVERLAPPING GRAPHIC ACCOUNTS
OF PEDOPHILIA, BEASTIALITY, AND INTERNET
THREATS RESULTING IN A CLEAR INABILITY FOR
ANYONE TO COMPARTMENTALIZE AND ASSESS THE
CHARGES AGAINST EACH OF THE SEPARATE VICTIMS.
(P. 12-17)

**<u>TABLE OF CONTENTS (continued)</u>**

<u>POINT II</u>

     THE DISTRICT COURT ABUSED ITS DISCRETION BY ALLOWING THE ADMISSION OF AN AVALANCHE OF BAD-ACTS EVIDENCE, IN THE WAKE OF THE JOINDER OF IDENTICIAL OFFENSES PERTAINING TO TWO MINOR VICTIMS, WHICH WAS PREJUDICALLY REDUNDANT TO THE MUTUALLY CORROBORATING TESTIMONY FROM THE TWO VICTIMS. (pgs. 17-25)

<u>POINT III</u>

     THE DENIAL OF WARES' MOTION TO BE TRIED UNDER A PSEUDONYM TO PROTECT HIS IDENTITY REQUIRES A NEW TRIAL IN LIGHT OF THE HEINOUS NATURE OF THE CHARGES AND THE FACT THAT THE NIBBLE USE OF THE INTERNET WAS A PROMINENT FEATURE OF THE TRIAL. (pgs. 25-27)

<u>POINT IV</u>

     THE IMPOSITION OF A LIFE-TERM OF IMPRISONMENT FOR NON-HOMICIDE OFFENSES WAS EXCESSIVE AND BASED ON UNDUE WEIGHT ON THE NATURE OF THE CHARGES. (p. 28)

Conclusion……………………………………………………………………29

Attached  Appendix with cover and contents, pgs. 1-133

# TABLE OF AUTHORITIES

**Federal Cases**                                                    Page

Arizona v. Fulminante,   499 U.S. 279 (1991) … ………………………………25

Huddleston v. United States, 485 U.S. 681 (1988)………………………………18

Froe v. Aware Woman Ctr. For Choice, Inc., …………………………………  26

United States v. Cook, 538 F.2d 1000 (3d Cir. 1976)……………………………19

United States v. Davis, 726 F.3d 434 (3d Cir. 2013)……………………………18

United States  v. Doe, 655 F.2d 920 (9th Cir. 2008)…………………………..26

United States v. Givan, 320 F.3d 452 (3d Cir. 2003)………………………  .18

United States v. Graci, 504 F.2d 411, 413  (3d Cir. 1974)………………………13

United States v. Green, 617 F.3d 233 (3d Cir. 2010)………………… . ……18, 20

United States v. Green, 563 Fed. Appx. 913 (3d  Cir. 2014)………………… …14

United States v. Haas, 184 Fed.Appx. 230, 234 (3d Cir. 2006)…………………20

United States v. Hagins, 452 Fed. Appx. 141 (3d Cir. 2011)……………………23

United States v. Jemal, 26 F.3d 1267 (3d Cir. 1994)……………………………18

United States v. Lee,  2015 U.S. Dist. LEXIS 181945 (M.D.Pa 2015)……...15, 16

United States v. Reicherter, 647 F.2d 397, 400 (3rd Cir. 1981)………… ...…13, 14

United States v. Scarfo, 850 F.2d 1015 (3d Cir. 1988)…………………………..19

# TABLE OF AUTHORITIES (continued)

United States v. Smith, 725 F.3d 340 (3d Cir. 2013)……………………………..18

United States v. Sriyuth, 98 F.3d 739 (3d Cir. 1996)……………………………19

Zafiro v. United States, 506 U.S. 534 (1993)………………...………… ……….14

**New Jersey Cases**

State v. Collier, 316 N.J. Super. 181 (App. Div. 1998)…………………………..22

State v. Orlando, 101 N.J. Super. 390 (App. Div.), cert. den. 52
    N.J. 500 (1968)………………………………………………………..…….14

**Federal Rules**

Fed.R.Crim.Proc. 14……………………………………………………………  13

Fed. R. Evid. 403………………………………………………………………  23

Fed. R. Evid. 404(b)……………………………………………………………  22

**Other Authority**

Juror Use of Social Media: Closing the Evidentiary Back Door,
    By Andrew B. Flake, November 14, 2013 (Copyright 2016 ABA)……………27

## JURISDICTIONAL STATEMENT

Clifford Wares was found guilty of the following six offenses involving two under-aged minors by a jury before the United States District Court:

18:2251 (a) & 2 Production of Child Pornography -- Count 1

18:2422 (b) & 2 Online Enticement of a minor -- Counts 2 & 4;

18:875 (d) Interstate Extortionate Threat -- Counts 3 & 6; and

18:2423 (b) & 2 Interstate Travel to engage in illicit sexual conduct –
Count 5.

(App. 6)[1] As pronounced on June 27, 2016, defendant was sentenced as follows: life Imprisonment on each of counts 2 & 4; terms of 360 months on each of counts 1 & 5, and terms of 24 months on each of counts 3 & 6, all to be served concurrently. (App. 105-106)  This is an appeal of the District Court's judgment entered on the criminal docket on July 7, 2016 (App. 6-11)

Pursuant to the Federal Rule of Appellate Procedure 4(b)(1), Wares filed his timely notice of appeal on   July 8, 2016. (App. 1) This Court has jurisdiction pursuant to 18 U.S.C. 3742(a) and 28 U.S.C. 1291.

_____

1 "App." followed by a number denotes the relevant page of the appendix to the brief. The Presentence Investigation Report and Statement of Reasons for the sentence have been filed separately and under seal.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

Counsel is aware of no other case or proceeding completed, pending or about to be presented to this Court or any other court or agency, state or federal that is in any way related to this appeal.

## STATEMENT OF THE ISSUES

### I

**DID THE DISTRICT COURT ERR BY DENYING WARES' MOTION TO SEVER THE SIX OFFENSES, INVOLVING TWO MINOR VICTIMS,  INTO TWO SEARATE TRIALS?**

#### Preservation of Issue

Defense counsel moved to sever the six offenses into two separate trials.

### II

**DID THE DISTRICT COURT ERR BY ADMITTING OTHER BAD-ACTS EVIDENCE WHICH INCLUDED DETAILS OF BESTIALITY, AS WELL AS A PRIOR INCRIMINATING STATEMENT TO POLICE AND TESIMONY BY A THIRD VICTIM, WHO WAS NOT SUBJECT OF THE INDICTMENT?**

#### Preservation of Issue

The District Court Granted the Government's motion to admit other bad-acts evidence and defense counsel objected throughout the trial to that evidence.

2

**III**

**IN THIS EXTRAORDINARY CASE, DID THE DISTRICT
COURT ERR IN DENYING WARES' MOTION TO BE
REFERRED TO BY A PSEUDYNOM DURING TRIAL?**

Preservation of Issue

The District Court denied counsel's motion to refer to Wares' by a
pseudonym throughout trial.

**IV**

**WAS WARES' LIFETIME SENTENCE OF IMPRISONMENT
FOR NON-HOMICIDE OFFENSES EXCESSIVE?**

Preservation of Issue

Defense counsel submitted a sentencing memorandum seeking a lesser
sentence for Wares.

## STATEMENT OF THE CASE

### a. Statement of Facts

 This disturbing case involves evidence that Wares, through various

electronic means such as Facebook, emails and text messages, contacted two

minors, Kaitlyn and Hannah, in the summer of 2011, both of whom resided in

West Milford, New Jersey. The two girls claimed that Wares enticed them by a

series of friendly and deceptive messages which eventually led to sexual requests

and then to threats.  As a consequence, Kaitlyn, who never met Wares, sent

3

numerous nude and graphic photos of herself, while Hannah –- later in the summer -- actually met Wares and performed fellatio on him and, in a second meeting, was supposed to have sex with a dog that Wares brought with him. Both girls also testified that Wares wanted them to enjoy bestiality and have sex with a dog. Unlike Kaitlyn, Hannah actually met Wares twice. Repetitive and graphic evidence about bestiality was presented throughout the trial.

### *Hannah*

In May of 2011, Hannah, aged 14 years old at the time and a West Milford student, reached out on her Facebook account to communicate with anyone under 25 years of age.   In response, Wares contacted her and told her that he was 25 years old.  They exchanged friendly banter and at the end of May, Hannah agreed to meet Wares who picked her up in his pickup truck. They drove to a nearby park and walked along a trail. He then took off his jacket, put it on the ground and had Hannah perform fellatio on him. He also touched her breasts and vagina. She later, again reluctantly, performed fellatio on him when they got back to his truck. (7T 35-17 to 55-18)[1]

---

[1] "1T" refers to the transcript dated May 4, 2016.
 "2T" refers to the transcript dated May 6, 2016.
 "3T" refers to the transcript dated May 9, 2016.
 "4T" refers to the transcript dated May 10, 2016.
 "5T" refers to the transcript dated May 11, 2016.
 "6T" refers to the transcript dated May 12, 2016.
 "7T" refers to the transcript dated May 13, 2016.

They continued to text one another and Wares told her he was 39 years old. He also wanted her to try bestiality by having sex with a dog. They met again and Wares brought a dog with him for her to have sex with. However, Hannah simply took the dog and left. Thereafter, Wares was mean and aggressive with her online. Hannah told him to leave her alone.  In response, he threatened to seek her out, kill the dog and tell her classmates that she had sex with a dog. (7T 55-18 to 65-12) Over renewed objection (7T 85-16 to 20; 87-13 to 14; 89-3 to 90-22), Hannah also identified numerous and graphic messages that Wares sent to her, including messages about bestiality and that he wanted her to have sex with a dog. (7T 85-13 to 94-17)

Later on, Hannah found out that Wares had made a fake Facebook profile of her which urged her classmates to have sex with a dog. In response, her classmates -- Katie and Taylor -- made fun of her. She sent messages to them indicating that one of her profiles was fabricated by Wares and testified that she did not send any of the lurid messages that were sent from the phony Facebook account. Hannah finally told her mother about her experience. In November of 2011, the West Milford police contacted her and she told them about her experience with Wares but did not tell them that she actually met him. Later, in an interview with the FBI

---

"8T" refers to the transcript dated May 16, 2016.
"9T" refers  to the transcript dated May 17, 2016.
"10T" refers to the transcript dated June 17, 2016.

5

in December of 2015, she told them the whole account with Wares. (7T 71-4 to 103-10)

*Kaitlyn*

Later in the summer of 2011, Kaitlyn, 13 years old at the time, received a Facebook friend request from a girl she thought was Hannah, a classmate of hers in West Milford.  The message actually was sent by Wares who fabricated Hannah's Facebook account.  The fake Hannah indicated that she knew a boy named "Cliff" who was interested in Kaitlyn.  Kaitlyn never socialized with Hannah except by way of the Internet. Thereafter, Kaitlyn contacted "Cliff" by way of a text message to the number she received.  Kaitlyn spoke to Wares some 50 times over the phone and confided in each other about their problems. Wares told her that he wanted to be her boyfriend.  Kaitlyn, at Wares' request, sent naked pictures of herself as well as graphic pictures of her breasts and genitalia, and Wares sent her naked and provocative pictures of himself. Wares wanted her to try bestiality and have sex with a dog.  He also, as Kaitlyn realized, falsely told her that he knew other classmates, Katie, Adrianna, and Taylor, and fabricated Facebook accounts in their names to graphically urge Kaitlyn to have sex with him as well as with a dog. Kaitlyn, as with Hannah, acknowledged that dozens of the extremely graphic messages were sent to her, both by Wares and the phony Facebook accounts. She also realized that the Facebook, "Bob Sponge," was also fabricated by Wares and

urged her to have sex with him and with a dog.  When she became reluctant to send

more pictures or to have sex with him, Wares threatened to ruin her reputation by

disseminating her pictures to her peers. (6T 19 to 64; 80 to 109)

Kaitlyn became distrustful of Wares, who claimed to be 28 years, but looked

older in the pictures – she found out that he was 38 years old.  She changed her

phone number and Facebook account, but Wares was able to find those new

accounts and messaged her that he would move to where she claimed she was

moving and that he wanted to have a baby with her.  She became even more scared

and finally told her father about her experience. They went to the West Milford

Police Department where they told the police about Kailtyn's experience with him.

An investigation, in concert with the New York State Police and the Passaic

County Police Department led to the arrest of Wares in Smith Cove Park in

November of 2011, where he was living in a tent. (5T 60-18 to 62-3; 6T 68 to 80)

*Other Evidence*

Taylor, 14 years old time at the time and who was not named in the

indictment as a victim, testified, over defense objection, that she received what

turned out to be fake Facebook messages from Hannah urging her to meet, Cliff,

the defendant. As with Hannah and Kaitlyn, she began communicating with Wares

who wanted to "hang out" out with her.  She and a friend, Katie, ultimately did so

at Brown's Point Park in West Milford, but instead of giving sex in return for

7

alcohol, they just took the alcohol from Wares and left. Over renewed defense objection (6T 146-15 to 152-12), Taylor, as with the others, acknowledged graphic messages she received from the phony Hannah, including detailed messages about bestiality. (6T 176-7 to 218-14)

A New York State Police investigator, over defense objection, testified that he "interviewed" Wares back in May of 2009, and that Wares admitted creating a phony Facebook account for an underage girl, Lindsey. Wares also admitted that he asked Lindsey to have oral sex and ultimately threatened her in a graphic message, calling her a "stupid cunt" and that he and his friends would exact revenge. (6T 123 to 135-19)

There was also evidence from Wares' probation officer, presented as a "government official" who testified that she regularly visited him and identified a pickup truck, a Mustang and a small dog, which were later identified by the victims. (5T 85-2 to 99-8)

Finally, in addition to the identification of the messages by Kaitlyn, there was technical evidence that the manipulative messages received on Kaitlyn's phone were connected to Wares as well as Kaitlyn's Facebook account. (5T 8-24 to 37-5; 110-4 to 141-16)

The jury found Wares guilty as charged and he was sentenced to a lifetime of imprisonment.

8

**b. Procedural History and Rulings**

An indictment for criminal case number 15-cr-570(ES), issued by the United States District for New Jersey, charged defendant, Clifford Wares, with the following six counts: 1) production of child pornography against Minor Victim 1 (later referred to as "Kaitlyn"), contrary to 18 U.S.C. 2251(a) and section 2; 2) online enticement of a minor to engage in criminal sexual conduct against Kaitlyn, contrary to 18 U.S.C. 2422(b) and section 2; 3) interstate extortionate threat against Kaitlyn, contrary to 18 U.S.C. 875(d); 4) online enticement of a Minor Victim 2 (later referred to as "Hannah"), to engage in criminal sexual conduct, contrary to 18 U.S.C. 2422(b) and 2; 5) interstate travel to engage in illicit sexual conduct against Hannah, contrary to 18 U.S.C. 2423(b) and 2; and 6) interstate extortionate threat, contrary to 18 U.S.C. 875(d) against Hannah. (App. 125-126)  These charges resulted from incidents that occurred between June through September of 2011, involving two underage females.

On May 4th and 6th of 2016, the Honorable Esther Salas, U.S.D.J., heard several motions from the Government and defendant Wares.    **Ruling 1:** The Court also denied Wares' motion to sever the allegations regarding Kaitlyn from those involving Hannah into two separate trials (App. 18-19)  and  **Ruling 2:** defense counsel, in a pre-trial motion, objected to any bad-acts evidence that might be

9

presented at trial and, noting that the two victims corroborated each other, asserted that such evidence should be closely scrutinized. (App. 115-118)  Nevertheless, the court granted the Government's motion, over defense objection, to admit incriminatory bad-acts material from Wares' two prior convictions .  Defense counsel also objected to the numerous electronic messages, which included detailed counts of bestiality, as "piling on" in an emotionally charged case. (App. 19-56) Counsel interposed objections to the prejudice of the other bad-acts evidence, including bestiality, throughout the trial, as detailed in Point II;  **Ruling 3:** The Court also denied Ware's motion to employ a pseudonym in place of his name during the trial. (App. 13-16)

On May 10, 2016, a jury trial commenced, in defendant's voluntary absence. On May 17, 2016, the jury found Wares guilty as charged. (9T 80-5 to 81-11) **Ruling 4:** the Court rejected defense counsel's sentencing memorandum and argument for a lesser sentence and imposed an aggregate lifetime of imprisonment for the six convictions.  (App. 105-106)

## SUMMARY OF THE ARGUMENT

As it pertains to **Point I**, there was an abuse of discretion by the District Court in denying Wares' motion to sever the nearly identical offenses pertaining to each of the two victims into two separate trials since the joint trial improperly

allowed for each victim to corroborate and bolster each other about the sole issue in the case – identification. In **Point II**, there was a further abuse of discretion by the District Court since an avalanche of repetitive and unnecessary bad-acts evidence, including details of bestiality, was presented throughout the trial. In **Point III**, the District Court abused its discretion by denying Wares' motion to refer to him by a pseudonym, especially in light of the horrific accusations and that the Internet and Facebook featured prominently throughout the trial. Finally, in **Point IV**, despite the heinous nature of the charges, the imposition of a lifetime sentence of imprisonment, for non-homicide offenses, was excessive.

## LEGAL ARGUMENT

### POINT I

**THERE WAS AN ABUSE OF DISCRETION BY THE DISTRICT COURT IN DENYING SEVERENCE SINCE THE CHARGES AGAINST**

**KAITLYN AND HANNAH WERE VIRTUALLY IDENTICAL BUT BASED UPON DIFFERING EVIDENCE WITH OVERLAPPING GRAPHIC ACCOUNTS OF PEDOPHILIA, BEASTIALITY, AND INTERNET THREATS RESULTING IN A CLEAR INABILITY FOR ANYONE TO COMPARTMENTALIZE AND ASSESS THE CHARGES AGAINST EACH OF THE SEPARATE VICTIMS.**

Prior to trial, the court dispensed with Ware's motion for two separate trials, one for each minor victim, by finding that a joint trial was appropriate pursuant to Rule 8 (App. 17-19), and that the joinder was not unduly prejudicial pursuant to Rule 14, as follows:

Second, severance under Federal Rule of Criminal Procedure 14 (A) is not appropriate in this case because severance would lead to wasteful and duplicative litigation.

As the government notes, it is likely that 10the same evidence and the same witnesses would be 11heard by the jury in both cases, if they were to be severed.

Furthermore, the government argues Wares' conduct with respect to each victim would likely be admissible in both trials.

Finally, the Court finds that the defendant's concerns regarding the potential for prejudicial spillover of evidence between counts may be properly addressed with limiting instructions that the jury compartmentalize the evidence presented and consider each count separately and independently.

Accordingly, the Court denies the defendant's motion to sever counts 1 through 3 from counts 4 through 6

(App. 19)  It is conceded that the joinder of the offenses, pertaining to two juvenile victims, was not improper under Rule 8 since the allegations were similar in nature.

However, the joinder of the offenses, which were almost identical regarding each of the two victims  (except for the sole child pornography charge of Count 1, pertaining to Kaitlyn), was wildly prejudicial since there was no way anyone could compartmentalize assessing the nearly identical charges against each of the two victims.

Federal Rule of Criminal Procedure 14 allows for relief from prejudicial joinder. United States v. Graci, 504 F.2d 411, 413 (3d Cir. 1974). According to Rule 14(a), if the joinder of offenses in an indictment appears to prejudice a defendant, the court may order separate trials of counts. A motion for severance under Rule 14 rests in the sound discretion of the district court. United States v. Reicherter, 647 F.2d 397, 400 (3d Cir. 1981).

Improper joinder under Rule 14 must be shown by clear and substantial prejudice. Id. Mere allegations of prejudice are not enough, and it is insufficient to establish that severance would improve the defendant's chance of acquittal. Id. Rather, the question of prejudice focuses on whether the jury will be able to *compartmentalize* the evidence as it relates to each count. See United States v. Green, 563 Fed. Appx. 913, 917-918 (3d Cir. 2014)  Moreover, if there is any risk

13

of prejudice, instructing the jury on its duty to consider each count independently is a proper remedy. See Zafiro v. United States, 506 U.S. 534, 540, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993).

Here, the prejudicial effect of joinder was monumental and could not be rectified by any limiting instruction. Severance should have been granted – without consideration of any other prejudicial factor - since each teenage victim, as indicated by counsel below (App. 28-30),  bolstered and corroborated the other as well as raising the unavoidable specter that Wares had the propensity to commit the very same crimes.

In State v. Orlando, 101 N.J. Super. 390, 391-94 (App. Div.), certif. denied, 52 N.J. 500 (1968) the appellate court concluded that severance should have been granted regarding sexual abuse of two different child victims on two different dates, since "the effect of the joinder was to give the State two witnesses instead of one to overcome defendant's denial of either offense and, in view of the abhorrent nature of the offense, to multiply the chances that defendant would be convicted." It is submitted that the logic in Orlando is inescapable.  There is simply no way a jury, or anyone for that matter, could possibly compartmentalize the nearly identical and heinous allegations involving two different juvenile victims but entailing two different sets of proofs and presented in the same trial.

Moreover, any semblance of compartmentalization was erased since the evidence regarding the nearly identical charges against the two victims was different. Most significantly, Hannah actually met Wares *twice* and performed fellatio on him, whereas Kaitlyn only communicated with him over the phone, text, and Facebook. Consequently, the proofs regarding Kaitlyn's electronic contacts with Wares were more complex, technical and ethereal. In addition, the threats against Kaitlyn's reputation involved disseminating nude and graphic pictures that she sent to Wares. The threats against Hannah, on the other hand, focused on her refusal to have sex with a dog. See United States v. Lee, 2015 U.S. Dist. LEXIS 181945 (M.D. Pa. 2015) (setting forth several cases involving facially disparate offenses involving one victim).

Furthermore, the emphasis on bestiality and graphic depictions of sex with dogs, which ran throughout the entire trial (App. 60-6; 88; 94; 98-100), was -- at most -- only relevant and intrinsic to Hannah, who claimed that, upon a second meeting, Wares actually brought a dog for her to have sex with. As a consequence of Hannah taking the dog from Wares without having sex, Wares threatened to kill the dog and to ruin her reputation by telling her classmates that she had sex with a dog. Otherwise, as explained below, the extremely prejudicial focus on details of bestiality was only tangential and inadmissible to the charges involving Kaitlyn, further underscoring the need for separate trials. Wares was not charged with

15

bestiality or animal cruelty and reference to such outrageous and graphic allegations especially polluted the aspect of the trial pertaining to the allegations involving Kaitlyn.

The logic in <u>Lee</u>, <u>supra</u>, is, in addition to <u>Orlando</u>, <u>supra</u>, compelling and applicable here. While Lee only involved one victim, the District Court found that the joinder of the enticing charge and the pornography charge was prejudicial, requiring severance.  Here, the situation is far worse since identical charges involved two victims.  If the two victims were subject to different offenses, a limiting instruction could make some sense regarding the requisite ability of the jury to compartmentalize in assessing different charges.  Here, instead, the limiting instruction was an abstraction when the jury is told to compartmentalize identical offenses against two victims. It is inconceivable that a jury, even if clearly instructed to compartmentalize, could avoid believing that if Wares was guilty of any of the charges regarding one victim, he must be guilty of the identical charge against the other victim, that is, Wares had the propensity to commit the very same offense against both victims – the very thing that rule 404(b) prohibits and which severance precludes.

Therefore, this Court should reverse Wares convictions and remand the matter for two separate trials regarding each victim.

## POINT II

**THE DISTRICT COURT ABUSED ITS DISCRETION BY ALLOWING THE ADMISSION OF AN AVALANCHE OF BAD-ACTS EVIDENCE, IN THE WAKE OF THE JOINDER OF IDENTICIAL OFFENSES PERTAINING TO TWO MINOR VICTIMS, WHICH WAS PREJUDICALLY REDUNDANT TO THE MUTUALLY CORROBORATING TESTIMONY FROM THE TWO VICTIMS.**

The trial court, over defense objection, granted the Government's motion to admit bad-acts evidence from Wares' two prior convictions.  (App. 19-3)   In addition, defense counsel objected to the numerous electronic messages that included details of bestiality as "piling on." (App. 80-87)   The trial court, over repeated defense objections, admitted a prejudicially massive amount of bad-acts evidence or purportedly "intrinsic" evidence, centered around mesmerizing and detailed accounts of bestiality that only reinforced the unavoidable and improper propensity inference that if Wares was capable of such fiendish attempts to get the victims to have sex with a dog, he inevitably had the propensity to commit the offenses which, while very serious, did not rise to the diabolical, albeit uncharged, perversion of getting the minors to have sex with a dog.

Under Rule 404(b), "[e]vidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be

admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b); *see also* Huddleston v. United States, 485 U.S. 681, 686, 108 S. Ct. 1496, 99 L. Ed. 2d 771 (1988;)  United States v. Smith, 725 F.3d 340 (3rd Cr. 2013);  United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010).

Rule 404(b) is a Rule of inclusion rather than exclusion, United States v. Jemal, 26 F.3d 1267, 1272 (3d Cir. 1994),   and thus favors admissibility so long as the evidence is "relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime." United States v. Givan, 320 F.3d 452, 460 (3d Cir. 2003) (internal quotation marks omitted). Determining whether the prior act evidence is admissible under Rule 404(b) requires consideration of a four-part test, whether the evidence is: (1) offered for a proper purpose; (2) relevant to that purpose; (3) sufficiently probative under the Rule 403 balancing requirement; and (4) accompanied by a limiting instruction, if requested. United States v. Davis, 726 F.3d 434, 441 (3d Cir. 2013). The Government has the burden of demonstrating that the evidence is admissible under Rule  404(b). While the Government's burden is "not onerous," it must still "clearly articulate how that evidence fits into a chain of logical inferences, no link of which can be the inference that because the defendant committed [the] offenses before, he

therefore is more likely to have committed this one." <u>United States v. Sampson</u>, 980 F.2d 883, 887, 888 (3rd Cir. 1992).

Rule 403, which is not confined to Rule 404(b), plainly provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In deciding whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, the trial judge must appraise the "genuine need" for the evidence. <u>United States v.</u> Scarfo, 850 F.2d 1015, 1019 (3rd Cir. 1988). "The treasured principles underlying the rule against admitting evidence of other crimes should be relaxed only when such evidence is *genuinely needed* and would be genuinely relevant." <u>United States v.</u> <u>Sriyuth</u>, 98 F.3d 739, 748 (3d Cir. 1996) (emphasis added), *quoting* <u>United States v. Cook</u>, 538 F.2d 1000, 1003 (3d Cir. 1976)

Finally, unlike extrinsic bad-acts evidence, "intrinsic evidence" is not subject to the Rule 404(b) test of admission. Nevertheless, there are only two differences between intrinsic and extrinsic evidence — intrinsic evidence does not require advanced notice of the acts to be admitted into evidence to be provided to the defense and the court need not issue a limiting instruction to ameliorate the taint of the evidence. <u>Green</u>, 617 F.3d at 247-48. Intrinsic evidence still must, however, be

19

relevant, survive a <u>Rule 403</u> balancing test, and be probative of something other than the defendant's criminal propensity. <u>Id.</u>; <u>see also</u> <u>United States v. Haas</u>, 184 Fed. Appx. 230, 234 (3rd Cir. 2006)(Intrinsic or "direct proof" evidence is also subject to Rule 403).

**Bestiality**

Detailed and graphic testimony about bestiality, from Kaitlyn, Hannah and Taylor permeated the trial. (App. 60-6; 88; 94; 98-100)  Defense counsel repeatedly objected to this toxic evidence and earlier on noted that such evidence, contained in numerous electronic messages, was "piling on."  (App. 14 to 17;  28-30)    The following provides only a sampling of some of the gratuitous and graphic testimony from the witnesses.   This from Kaitlyn:

> Kaitlyn, when you are with Cliff's dog, make sure that when you are doggie style that your legs are spread wide. It makes it easier for the dog to push the knot into you, which is what you want to happen so that the knot is fully in as far as can go in you.

(App. 60)  Kaitlyn was forced to provide other noxious details regarding bestiality. (App. 61)  And from Taylor, over defense objection (App.  62-68; 87), who was not even mentioned in the indictment:

> Hannah said not really dog, can't get you preggo or give you an STD like a guy and the fucking is a lot longer. My dog fucked me an hour straight, guys last two minutes and done. She said dogs make you have multiple orgasm, their cock got a round bulge at base that swells up in your pussy.

(App. 88)

Hannah's acknowledgement of the graphic recitation of Wares' messages to her included the following:

> I just need u and he dog to complete what we started. 2 cocks, 1 human and 1 dog just for ur 1 human pussy.

(App. 100)  Defense counsel renewed his objection to this testimony, echoing an earlier concern about "piling on." (App. 101-102).

Details of bestiality from Kaitlyn, Hannah, and Taylor were other bad-acts evidence admitted for the purported purpose of identification. It is submitted that such *details* were simply not relevant to or intrinsic "direct" proof of identification. There was plenty of duplicative evidence that Wares lured the girls through the Internet and also through phony Facebook accounts that he had created, and that he wanted to have sex with the under-aged victims.  Kaitlyn sent graphic photographs of herself. The three girls testified that Wares threatened to ruin their reputations if they failed to comply. There was technical evidence that linked the cell phones, numbers, and accounts to Wares. Taylor also identified Wares, as with Hannah, as the culprit resulting from a face-to-face meeting with him.  Even if somehow remotely relevant, the repetitive and detailed accounts of bestiality were way over the top. The miniscule probative value, as it pertained to the allegations, was overwhelmingly prejudicial and should have been excluded pursuant to Rule 403.

While Hannah's actual encounter with Wares and the dog was relevant and intrinsic to the 6th Count that pertained to her, the details of bestiality by her, Kaitlyn and Taylor gave the erroneous impression that somehow bestiality was the central focus of the trial. The only admissible aspect about bestiality was Hannah's second encounter with Wares where he brought the small dog to have sex with her. However, even in that sole instance, any arguably supportive "intrinsic" evidence regarding bestiality should have been sanitized. See State v. Collier, 316 N.J. Super. 181 (App. Div. 1998)("Although the evidence of defendant's guilt here was strong, we cannot conclude that the failure to sanitize the evidence [about burning a pitbull] did not lead the jury to a result it otherwise would not have reached. Stated another way, we are not confident that the error was not clearly capable of producing an unjust result").  All Hannah had to say is that Wares encouraged her to have sex with a dog, met with her in hopes that she would do so, and threatened to kill the dog since she simply took it away. Graphic details regarding bestiality were clearly designed to do only one thing – to paint Wares as even more of a despicable character.

Whether characterized as intrinsic or as Rule 404(b) evidence, the explicit testimony about Wares' requests for Kaitlyn and Hannah to have sex with a dog was not necessary to prove any of the charges against him.  Taylor's testimony made matters even worse and compounded the confusion prohibited against by

Rule 403 since she was not even a subject of the indictment.   The repetitive details

about bestiality peppered the entire trial and from various witnesses with an

inescapable capacity to emotionally shock, confuse, and dismay the jurors,

distracting them from properly assessing the evidence as it related to the

indictment. United States v. Hagins, 452 Fed. Appx. 141, 148 (3rd Cir.

2011)("Evidence is unfairly prejudicial only when it has 'an undue tendency to

suggest decision on an improper basis, commonly, though not necessarily, an

*emotional* one.' Fed. R. Evid. 403, Advisory Committee's Note'")).  The

Government, in summation, highlighted the bestiality evidence. (9T 22-1 to 15; 34-

10 to 17)  The upshot of the gratuitous and graphic nature of the evidence

essentially painted Wares as a pariah and confused the jury by suggesting that if

Wares was capable of such explicit and perverse communications with juveniles,

he was probably guilty of the charges against him.


**Wares' Prior 2009 Bad-Acts Statement**

New York State Police Detective Fulton, over defense objection (App. 20 to

43), testified that in 2009, Wares admitted to him that he had unsuccessfully tried

to meet a 15 year-old girl, Lindsey, on the Internet and in response sent the

following message to her:

You just don't fucking get it. Either way I win. You are such a stupid cunt. Do I need you? No. I already many [sic] talking to one of your classmates, and hooking up with her. The point to this is now fucking revenge. You promised to meet me. You refused to do so. Now I am taking you down with a little help from your own classmates....

(App. 103)

This prior bad-acts evidence under Rule 404(b), even if additionally relevant to identity, was extremely prejudicial and unnecessary since both Kaitlyn and Hannah -- bolstering and corroborating each other -- provided ample testimony that Wares fabricated Facebook accounts, lured them for sexual acts, and consequently threatened them when they did not comply.  The evidence was unnecessarily cumulative and confusing pursuant to Rule 403.

The only real consequence of this duplicative and prior bad-acts evidence was that since Wares acted similarly back in 2009, he had even more of a propensity to commit the crimes against Kaitlyn and Hannah, not to mention Taylor. The court's brief limiting instruction could not possibly dispel such a prohibited propensity inference.

Therefore, this Court should reverse Wares convictions and remand the matter for a new trial.

### *The Gratuitous and Repetitive Admission of the Details of Bestiality and Bad-Acts Evidence Was Structural Error and Went to the Very Integrity of the Trial*

Evidentiary issues do not normally fall within the rubric of *per se* structural

error.  However, even if the unnecessary details of bestiality and other bad-acts

evidence –- which ran throughout the entire trial -- were not enough for reversal

separately, the cumulative effect undermined the integrity and structure of the

entire trial and compels the reversal of Wares' convictions and a new trial. The

underlying foundation of the trial, regarding the indicted counts of luring,

pornography, and extortion, crumbled under the weight of the spectacle of graphic

dog sex. <u>See</u> <u>Arizona v. Fulminante</u>, 499 U.S. 279, 111 S. Ct. 1246, 1265, 113 L.

Ed. 2d 302 (1991)(Structural error is a defect in the trial mechanism itself, affecting

the entire trial process, and is per se prejudicial).

## <u>POINT III</u>

**THE DENIAL OF WARES' MOTION TO BE TRIED UNDER A PSEUDONYM TO PROTECT HIS IDENTITY REQUIRES A NEW TRIAL IN LIGHT OF THE HEINOUS NATURE OF THE CHARGES AND THE FACT THAT THE NIBBLE USE OF THE INTERNET WAS A PROMINENT FEATURE OF THE TRIAL.**

Prior to trial, counsel moved that Wares be tried under a pseudonym and

supplied the court with Exhibit 10 which set forth details of a simple Google search

that produced three pages of references to Wares' convictions and history of luring

teenage girls. (App. 109-114; 122-124)  This is a novel issue that this Court has not

directly addressed. Nevertheless, the court wrongly denied Wares' motion to be

referred to by a pseudonym during trial.  (App. 13 to 16)        In <u>United States v.</u>

<u>Doe</u>, 655 F.2d 920, 921 n. 1 (9th Cir. 2008), the Court permitted the use of

pseudonyms for defendant-appellants who were government witnesses and faced

long prison sentences where their safety might be imperiled.  The Court explained

as follows:

> We recognize that the identity of the parties in any action, civil or
> criminal, should not be concealed except in an unusual case, where
> there is a need for the cloak of anonymity. Where it is necessary,
> however, to protect a person from harassment, injury, ridicule or
> personal embarrassment, courts have permitted the use of
> pseudonyms. See, e.g., <u>United States v. Doe, 556 F.2d 391, 393 (6th
> Cir. 1977)</u>, where the court, in accordance with appellant's motion,
> "changed the style of the case to show "John Doe' as appellant in order
> to prevent unnecessary dissemination of information about (a)
> conviction which (had) been set aside" pursuant to the Youth
> Corrections Act; <u>United States v. Indian Boy X, 565 F.2d 585</u> (9 Cir.
> 1977), where the major issue before this court was whether a juvenile
> appellant's murder confession should have been suppressed, and
> fictitious names were used, the court noting that it had attempted
> throughout the opinion to protect the identity of the appellant in the
> spirit of the Juvenile Delinquency Act; <u>Doe v. Deschamps, 64 F.R.D.
> 652 (D.Mont.1974)</u> and cases there cited.

<u>Cf</u>. <u>also</u> <u>Roe v. Aware Woman Ctr. for Choice, Inc.</u>, 253 F.3d 678, 684–85 (11th

Cir. 2001); ("The ultimate test for permitting a plaintiff to proceed anonymously is

whether the plaintiff has a substantial privacy right which outweighs the customary

and constitutionally-embedded presumption of openness in judicial proceedings").

In Juror Use of Social Media: Closing the Evidentiary Back Door By

Andrew B. Flake – November 14, 2013, (Copyright © 2016, American Bar

Association)   The author recognizes that:

> For jurors conditioned to access social media regularly, often about
> even mundane topics, the temptation to use these devices to post about
> a trial will be strong. And that is in an ordinary case; in a high-profile
> matter, it will be almost irresistible.

The author's suggestion of a strong limiting instruction prohibiting the use of

any media, including a warning of fines and punishment if disobeyed, was not

given here at the end of the day.  (See e.g., 5T 144-15 to 146-7)

Wares submits that the public mentality in relation to the internet in the 21st

century has detrimentally and unfairly changed the playing field for certain

criminal defendants on trial before a jury. It is undeniable that the uses of internet

search engines such as Google and internet explorer are pervasive among a large

portion of the adult population. Additionally, users of social media such as

Facebook and Twitter are constantly bombarded with information from other users.

The internet is virtually at the fingertips of jurors who use smart phones 24/7. The

temptation for a juror to conduct a simple search of the name of a defendant's name

is great. A search of the name Clifford Wares would have resulted in pages of

highly inflammable and non-admissible information. If any juror were to be

exposed to such internet information then that juror would be tainted and Wares denied a fair trial.

The issue of social media raises another great potential for a juror becoming biased. The following hypothetical scenario illustrates how social media use by a juror can lead to an unfair trial. A juror tells friends or family members the juror is sitting on the case of USA vs. Clifford Wares. A friend or family member then posts on Facebook or Twitter information about Wares's criminal past that the friend or family member found on the internet. The juror in this scenario becomes improperly exposed to information about the defendant based upon posts of a friend or family member – posts that the juror has no way of knowing would have been posted.

The internet, in short, has made a completely lopsided playing field for a defendant in a criminal trial when that defendant has criminal history imbedded in the internet. The examples of how one out the 12 jurors could be unfairly influenced by internet information, intentionally or unintentionally, are too great to list out. The use of a pseudonym would level the playing field, making the trial similar to a trial in the pre-internet age.

Here, this is such an "unusual case" and trial reference to Wares by a pseudonym would be easier and more effective than repeatedly instructing and threatening the jury regarding defiantly accessing electronic media. The notorious

28

allegations of luring minors for sex and bestiality mandated that Wares only be referred to by a pseudonym at trial, especially since all of the allegations centered around Wares' use of the Internet and other electronic forms of communication. Consequently, despite the court's generic warnings, the ease and temptation for even one juror to find out more about Wares, outside of any evidence at trial, was probable and overrode any need to use his actual name. Therefore, this Court should reverse Wares' convictions and remand the matter for a new trial.

## POINT IV

### THE IMPOSITION OF A LIFE-TERM OF IMPRISONMENT FOR NON-HOMICIDE OFFENSES WAS EXCESSIVE AND BASED ON UNDUE WEIGHT ON THE NATURE OF THE CHARGES.

In a sentencing memorandum, defense counsel set forth an impassioned argument that Wares, aged 43, should receive a 25-year term of imprisonment where he would be released at the age of 68 and give him some nominal chance of redemption.  Counsel noted that the average life expectancy of a white male is 76.5 years and that Wares was sexually molested by his uncle and that he has been diagnosed with a litany of psychological disorders. Wares' mother, in a letter, expressed support and love for her son.  Defendant respectfully relies on his sentencing memorandum, dated June 15, 2016, in further support for a reduction of Wares' sentence so that he might have a few years to redeem himself.[2]   The court

---

[2] Counsel's letter has been submitted to this Court along with other sentencing materials.

rejected counsel's arguments and sentenced Wares to an aggregate lifetime of imprisonment. (10T 137-20 to 138-4).

This Court, at the very least, should reduce Wares' sentence to an aggregate 25 years of imprisonment.

## CONCLUSION

For the reasons stated in the foregoing, Wares' convictions should be reversed and the matter remanded for a new trial. Alternatively, for the reasons set forth in Point IV, this Court should reduce Wares' sentence.

Respectfully submitted,

*s/Thomas Ambrosio*
Thomas Ambrosio

Dated: January 3, 2017

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

It is hereby certified that Thomas Ambrosio is a member of the bar of the

Court of Appeals for the Third Circuit.


*s/ Thomas Ambrosio*
Thomas Ambrosio




Dated: January 3, 2017

## CERTIFICATION OF BRIEF FORMAT

I, Thomas Ambrosio, Attorney at Law in the State of New Jersey, hereby certify that the

electronic version of the attached brief sent by email to the Court was automatically scanned by,

Symantec AntiVirus Corporate Edition, version 8.00 and found to contain no viruses. I further

certify that the text in the electronic copy of the brief is identical to the text in the paper copies

of the brief filed with the Court. Finally, I certify that the brief complies with the type-volume

limitations set forth in Rule 32(a)(7) and contains,  in its entirety, 6,922 words


*s/ Thomas Ambrosio*
Thomas Ambrosio

Dated: January 3, 2017

## CERTIFICATE OF SERVICE

I, Thomas Ambrosio, Attorney at law in the State of New Jersey, hereby certify that I have filed this same day, both in electronic and paper form, the Brief for Appellant and served two (2) copies of the Brief and one (1) copy of the Appendix upon Assistant United States Attorney Mark Coyle, by first-class US mail to his office located at 940 Broad Street, Newark, NJ 07101.

*/s Thomas Ambrosio*
Thomas Ambrosio
Attorney for Clifford Wares

Dated:       January 3, 2017